UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARIF HUDDA, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| VROOM, INC., PAUL J. HENNESSY, and DAVID K. JONES, | |
| Defendants. | |

Plaintiff Arif Hudda ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of United States ("U.S.") Securities and Exchange Commission ("SEC") filings of Vroom, Inc. ("Vroom" or the "Company"), the Company's press releases, and analyst reports, media reports, and other publicly disclosed reports and information about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Vroom securities between June 9, 2020 and March 3, 2021, both dates inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Vroom was founded in 2013 and is based in New York, New York.  The Company is an ecommerce platform that buys and sells used vehicles.  Through the Company's online platform, consumers can research and select from thousands of fully reconditioned vehicles.  After a vehicle is purchased, the Company provides contact-free delivery to the buyer's driveway.

3.     Vroom became a public company through an initial public offering on June 9, 2020 (the "IPO").  Prior to the IPO, Vroom significantly reduced its inventory to account for an expected drop in demand as a result of the COVID-19 pandemic.

4.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) a lack of inventory had materially constrained Vroom's ability to increase revenues in the second quarter of 2020 and meet a surge in customer demand for online used vehicles; (ii) Vroom had slashed the average selling price per vehicle by over 15% in response to a sustained and fundamental market shift to lower-priced vehicles, and not simply because of the Company's temporary inventory reduction activities taken earlier in the year; (iii) Vroom's lack of adequate sales and support staff had resulted in degraded customer experiences, lost sales opportunities, and a greater than 10% increase in average days to sale for Vroom products; (iv) as a result of all the foregoing, Vroom needed to invest tens of millions of dollars in growing inventory and bolstering its sales and support and logistics networks, materially impairing the Company's short-term profitability; (v) as a result of all the foregoing, Vroom was generating materially lower profits per vehicle and poised to suffer accelerating losses and increased negative cash flows, despite a robust online used car market; (vi) as a result of all the foregoing, Vroom's inventory growth had far outpaced the capabilities of its existing sales and support personnel, creating a logistical bottleneck that threatened the Company's

2

profits, the value of its existing inventory, and its ability to achieve positive cash flows; (vii) as a result of all the foregoing, Vroom was unable to sell a significant portion of existing inventory as a result of inadequate sales personnel and overreliance on third-party sales support; (viii) as a result of all the foregoing, Vroom had been forced to mark down and liquidate existing inventory at fire sale prices; (ix) as a result of all the foregoing, Vroom was on track to miss its already disappointing fourth quarter 2020 profit and earnings guidance and such guidance lacked any reasonable basis in fact; and (x) as a result of all the foregoing, the Company's public statements were materially false and misleading at all relevant times.

5.      On August 12, 2020, Vroom issued a release announcing its financial results for the second quarter of 2020 (the "2Q20 Press Release").  That press release revealed that Vroom had achieved only $253.1 million in revenues for the quarter, a 3% year-over-year decline, largely as a result of a 17% decline in the average vehicle selling price per ecommerce unit.  Additionally, the 2Q20 Press Release stated that Vroom only expected to achieve an average total revenue per ecommerce unit of just $23,500 for the third quarter, which represented a 25% year-over-year average product price decline.  As a result of this lower average price, Vroom stated it achieved only $314 in average gross profit per ecommerce vehicle, a 75% year-over-year profit decline, and projected average gross profit per unit of only $1,600 to $1,700 for the third quarter of 2020. During the earnings call to discuss these results, Defendants essentially confirmed that the pricing pressures facing the Company were not short term but reflected a fundamental market shift toward lower-priced vehicles.

6.      On this news, Vroom's stock price fell $12.64 per share, or 18.32%, to close at $56.37 per share on August 13, 2020, on usually heavy trading volume of 6.8 million shares traded.

7.     Then, on November 11, 2020, Vroom issued a release announcing its third quarter 2020 financial results (the "3Q20 Press Release").  That press release stated that Vroom expected to suffer sharply higher losses in the fourth quarter of 2020, with adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") losses projected to increase from $36 million in the third quarter of 2020 to $48 million at the midpoint, a 33% sequential increase.  During the accompanying earnings call, Defendants revealed that Vroom was suffering from a "bottleneck" in its sales support and needed to invest heavily in building out the Company's sales support and logistics networks to avoid constrained growth, despite the favorable market environment.

8.     On this news, Vroom's stock price fell $5.31 per share, or 13.01%, to close at $35.49 per share on November 12, 2020, on unusually heavy trading volume of 9.2 million shares traded.

9.     Finally, on March 3, 2021, Vroom issued a release announcing its fourth quarter and full year financial results (the "4Q/FY20 Press Release").  That press release was the third consecutive adverse report by the Company since going public and revealed operational issues and financial results far worse than previously disclosed to investors.  For the quarter, the 4Q/FY20 Press Release stated that Vroom suffered a net loss of $60.7 million, a 42% year-over-year increase.  This represented a $0.46 loss per share, which was outside the range provided by Defendants and 20% worse than the midpoint.  The 4Q/FY20 Press Release also stated that Vroom suffered a $55.9 million adjusted EBITDA loss during the quarter, which was also outside the range provided by Defendants and $8 million worse than the midpoint.  The 4Q/FY20 Press Release further stated that Vroom had achieved only $1,821 total gross profit per unit, which was outside the range provided by Defendants and 13% below the midpoint, and generated only $878 gross profit per vehicle, which represented a 13% decline year-over-year.

10.     During the earnings call to discuss the results held that same day, Defendant Hennessy revealed that Vroom was suffering from severe sales backlogs because of inadequate sales and support staff, which had materially impaired the Company's ability to sell existing inventory. These backlogs, in addition to degrading the customer experience, had led to substantially lower gross profits per unit and caused the average days to sale per vehicle to increase 13% year-over-year to seventy-seven days.   Defendants acknowledged that Vroom was operationally constrained and unable to keep up with demand because of these sales constraints, which had forced the Company to liquidate aging inventory at fire sale prices for a significantly reduced profit or even at a loss, despite a historically favorable online used car market.   Defendants further revealed that Vroom's sales deficiencies were so severe that the deficiencies would continue to constrain the Company's profits well into the first quarter of 2021, even though Vroom had purportedly tripled its sales support staff.   As Defendant Hennessy admitted, "we bought more inventory than we could actually process and that excess inventory needed to be moved in Q4 and will continue to be moved in Q1."

11.     Following these disclosures, Vroom's stock price fell $12.29 per share, or 28%, to close at $31.61 per share on March 4, 2021, on unusually heavy trading volume of 19.6 million shares traded.

12.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

13.    The claims alleged herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

15.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), and Section 27 of the Exchange Act, because Vroom is headquartered in this Judicial District and many of the acts and practices complained of herein occurred in substantial part in this Judicial District.

16.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

17.    Plaintiff, as set forth in the attached Certification, acquired Vroom securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

18.    Defendant Vroom is a Delaware corporation headquartered in New York, New York.  It is an ecommerce platform for buying and selling used vehicles.  Vroom stock trades on the NASDAQ Global Select ("NASDAQ") under the ticker symbol "VRM."

19.    Defendant Paul J. Hennessy ("Hennessy") was Vroom's Chief Executive Officer at all relevant times and a member of the Company's Board of Directors (the "Board").

20.     Defendant David K. Jones ("Jones") was Vroom's Chief Financial Officer at all relevant times.

21.     Defendants Hennessy and Jones are referred to herein collectively as the "Individual Defendants."

22.     Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, acquisition plans, and present and future business prospects, as alleged herein.  In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

23.     As officers and controlling persons of a publicly-held company whose securities are registered with the SEC pursuant to the Exchange Act and trade on the NASDAQ, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, services, markets, competition, acquisition plans, and present and future business prospects.  In addition, the Individual Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.  Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

24.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

25.     Vroom and the Individual Defendants are collectively referred to herein as "Defendants."

26.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Vroom securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding Vroom's business, operations, services, and present and future business prospects; (ii) enabled Defendants to conduct a public stock offering in which they raised hundreds of millions of dollars from investors at artificially inflated prices; and (iii) caused Plaintiff and the Class to purchase Vroom securities at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### Background

27.     Vroom was founded in 2013 and is based in New York, New York.  The Company is an ecommerce platform that buys and sells used vehicles.  Through the Company's online

8

platform, consumers can research and select from thousands of fully reconditioned vehicles. After a vehicle is purchased, the Company provides contact-free delivery to the buyer's driveway.

28.     Vroom operates in three business segments: (i) Ecommerce, which represents retail sales of used vehicles through Vroom's ecommerce platform; (ii) Texas Direct Auto ("TDA"), which represents retail sales of used vehicles from the Company's one physical location located in Houston, Texas; and (iii) Wholesale, which represents sales of used vehicles through wholesale auctions. The Ecommerce segment accounted for 49% of Vroom revenues in 2019, while TDA and Wholesale accounted for 33% and 18% of 2019 revenues, respectively.

29.     Vroom became a public company through the IPO. Prior to the IPO, Vroom significantly reduced its inventory to account for an expected drop in demand as a result of the COVID-19 pandemic. The Company also furloughed approximately one-third of its workforce. By the time of the IPO, Vroom claimed that these demand trends had sharply reversed, causing the Company to appropriately ramp up inventory acquisitions to pursue profitable growth initiatives. The Company also stated that 60% of furloughed employees had returned to work. As a result, Defendants claimed that by the time of the IPO Vroom was "currently building our inventory to take advantage of our position and value proposition in the used automotive market" and positioned to take advantage of "enhanced opportunities arising from greater consumer acceptance of our business model as a result of the COVID-19 disruptions."

**Materially False and Misleading Statements Issued During the Class Period**

30.     The Class Period starts on June 9, 2020, when Vroom filed the prospectus for the IPO with the SEC on Form 424B4, which incorporated and formed part of the registration statement for the offering (the "IPO Registration Statement"). The IPO Registration Statement was signed by the Individual Defendants. The IPO Registration Statement stated that Vroom

maintained "scalable and vertically integrated operations" and utilized data science and machine learning to "drive optimization and operating leverage across our ecommerce and vehicle operations" and to "enhance the customer experience . . . and optimize our overall inventory sales velocity."  The IPO Registration Statement similarly emphasized Vroom's "[e]normous inventory selection" and "[e]xceptional customer support."

31.     The IPO Registration Statement further stated that Vroom had been "strategically" building inventory for over a month that "will convert at target margins" and allow the Company to "ultimately exceed pre-COVID-19 levels," stating, in relevant part, as follows:

> **On April 20, 2020, we began to acquire new inventory, with a primary focus on high-demand models that we believe will convert at target margins. We intend to strategically build our inventory levels in the near term to return to and ultimately exceed pre-COVID-19 levels.**

32.     The IPO Registration Statement likewise represented that Vroom employed a sophisticated, data-rich inventory management system to meet "real-time" fluctuations in customer demand and profitably adjust pricing, stating, in relevant part, as follows:

> **Inventory Management**
>
> Our inventory assortment and pricing models ingest millions of data points each day as **we monitor, calibrate, and adjust our inventory position to fluctuations in the national market and within our ecommerce platform, including predicted sales performance and real-time customer demand and conversion**.
>
> *Inventory Planning*
>
> Using national demand and conversion data, including both Vroom historical performance and third-party sales, we establish target inventory levels by vehicle type, price point, mileage, features, and other key attributes. **We seek to maintain an optimal inventory mix to produce desired profits, sales velocity, and conversion outcomes as we manage our overall gross profit and growth rates**.
>
> *Inventory Procurement*
>
> We source inventory from auctions, consumers, rental car companies and dealers. As we acquire vehicles, we continuously monitor inventory levels against our

overall inventory model. ***In sourcing vehicles, we ingest supply available for sale nationally in the wholesale market and target vehicles for purchase based on our retail criteria, target margins, expected sales velocity and consumer demand that we see on our ecommerce platform and across our network of marketing partners***.

*Inventory Pricing*

Using recent national sales data and leveraging proprietary data analytics, we establish the likely fair market value of each distinct VIN in our inventory, making adjustments based on the unique characteristics of the vehicle. ***Once the vehicle is posted for sale, we monitor real-time demand, conversion, sales velocity, and profitability data across our listed inventory. Using our data analytics, we constantly evaluate a variety of variables that impact conversion and adjust pricing, if needed, within our profitability targets***.

33.     The IPO Registration Statement highlighted Vroom's purportedly robust growth trajectory, which the IPO Registration Statement attributed to proper inventory management, among other factors, stating, in relevant part, as follows:

> ***Our business has grown significantly as we have scaled our operations***. Our growth is not attributable to a single innovation or breakthrough, but to coalescence around multiple strategies that serve as points on our flywheel. ***The diversity and number of vehicles in our inventory drive demand and support expanded national marketing to enable us to acquire new customers more cost effectively, allowing us to invest back into our platform to continue to improve the customer experience, all of which drives increased conversion. This flywheel revolves, builds momentum and ultimately propels our business forward as we seek to drive disciplined growth and operating leverage***.

34.     The IPO Registration Statement listed Vroom's ability to "Grow and Optimize Vehicle Inventory" as the first key growth strategy on the Company's "Growth Flywheel," stating that Vroom used "data analytics to inform our pricing and inventory selection, which enables us to curate an optimal inventory that matches demand signals, driving higher conversion and sales." The IPO Registration Statement further stated: "As we grow, we will continuously refine our inventory mix and expand our offerings across vehicle price points to serve a greater range of customers and increase our demand and conversion opportunities."

35.     The IPO Registration Statement stated that Vroom was experiencing tremendous revenue growth, particularly in the Company's ecommerce segment, stating that Vroom's "ecommerce revenue grew at a 77.0% compound annual growth rate ('CAGR') from 2016 to 2019, including year-over-year growth of 95.3% from 2018 to 2019."  The IPO Registration Statement similarly stated, in relevant part, as follows:

> For the year ended December 31, 2019, we generated $1.2 billion in total revenue, representing a 39.3% increase over $855.4 million for the year ended December 31, 2018. For the three months ended March 31, 2020, we generated $375.8 million in total revenue, representing a 59.9% increase over $235.1 million for the three months ended March 31, 2019.

The IPO Registration Statement further represented that Vroom was "continu[ing] to invest in growth to scale our company responsibly and drive towards profitability."

36.     The IPO Registration Statement contained the following chart illustrating Vroom's purportedly robust ecommerce revenue growth:



37.     On June 10, 2020, less than three weeks before the end of Vroom's second fiscal quarter, Defendant Hennessy conducted an interview with investor news site *TheStreet*, in which he claimed that Vroom was experiencing a surge in customer demand which made it an ideal time to take Vroom public.  Defendant Hennessy stated that the online used car market had "stabilized" and customers were now "twice as likely" to buy a used vehicle online compared to three months previously, "so we really see the markets coming our way."

38.     On June 11, 2020, Defendant Hennessy conducted another interview with investor news site *TheStreet*, in which he highlighted the purportedly massive market opportunity for Vroom's products.  Defendant Hennessy represented that a shift to individual car ownership had been a "positive tailwind" for Vroom's business.  He further claimed that with the "growth that we've had and now the continued tailwind that we're seeing in our business, all I can say is that Vroom is in an excellent position to enter the public markets."  Defendant Hennessy similarly represented that the Company's recent employee furloughs were "just about in our rearview window, and now we're back to work and scaling the business."

39.     The statements referenced in ¶¶ 30-38 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) a lack of inventory had materially constrained Vroom's ability to increase revenues in the second quarter of 2020 and meet a surge in customer demand for online used vehicles; (ii) Vroom had slashed the average selling price per vehicle by over 15% in response to a sustained and fundamental market shift to lower-priced vehicles, and not simply due to the Company's temporary inventory reduction activities taken earlier in the year; (iii) Vroom's lack of adequate sales and support staff had

resulted in degraded customer experiences and lost sales opportunities; (iv) as a result of all the foregoing, Vroom needed to invest tens of millions of dollars in growing inventory and bolstering its sales and support and logistics networks, materially impairing the Company's short-term profitability; (v) as a result of all the foregoing, Vroom was generating materially lower profits per vehicle and poised to suffer accelerating losses and increased negative cash flows, despite a robust online used car market; and (vi) as a result of all the foregoing, the Company's public statements were materially false and misleading at all relevant times.

40.     Additionally, Defendants violated their affirmative obligations to provide certain material information in SEC filings as required by applicable SEC rules and regulations. Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303 ("Item 303"), required Defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a materially favorable or unfavorable impact on net sales or revenues or income from continuing operations."  In addition, Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105 ("Item 105"), required, in the "Risk Factors" section of the IPO Registration Statement, a "discussion of the material factors that make an investment in the registrant or offering speculative or risky" and that each risk factor "adequately describe[] the risk," including by concisely explaining "how each risk affects the registrant or the securities being offered."  Defendants' failure to disclose the information in ¶ 39 violated Item 303 and Item 105, because these adverse facts, trends, and uncertainties were known to Defendants and involved some of the most significant factors impacting the risk profile of Vroom securities and were likely to, and did, have a material adverse impact on Vroom's sales, revenues, and income from continuing operations.

**The Truth Begins to Emerge**

41.     On August 12, 2020, Vroom issued the 2Q20 Press Release.  That press release revealed that Vroom had achieved only $253.1 million in revenues for the quarter, a 3% year-over-year decline, largely as a result of a 17% decline in the average vehicle selling price per ecommerce unit.  Even more troubling, the release stated that Vroom only expected to achieve an average total revenue per ecommerce unit of just $23,500 for the third quarter, which represented a 25% year-over-year average product price decline.  As a result of this lower average price, Vroom stated it achieved only $314 in average gross profit per ecommerce vehicle, a 75% year-over-year profit decline, and projected average gross profit per unit of only $1,600 to $1,700 for the third quarter of 2020.  During the earnings call to discuss these results, Defendants essentially confirmed that the pricing pressures facing the Company were not short term but reflected a fundamental market shift toward lower-priced vehicles.

42.     On this news, Vroom's stock price fell $12.64 per share, or 18.32%, to close at $56.37 per share on August 13, 2020, on usually heavy trading volume of 6.8 million shares traded. Despite this decline in the value of the Company's share price, Vroom securities continued to trade at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding the adverse events, trends, and uncertainties negatively impacting Vroom's business.

43.     For example, in the 2Q20 Press Release, Defendant Hennessy stated that Vroom was "'well positioned . . . to take advantage of shifting consumer buying and selling patterns,'" stating, in relevant part, as follows:

> "I am pleased with our results for the second quarter, in which we performed substantially ahead of our growth plan, and I am encouraged by both the continued validation of the Vroom model and the performance of our employees in a tough environment. During the course of this single quarter, we managed through

significant swings in demand and numerous operational challenges brought on by the COVID-19 pandemic. In response to the drop in demand and uncertainty around vehicle pricing early in the pandemic, we chose to de-risk the business by significantly reducing our inventory during the first half of the quarter. As demand increased and pricing became more stable through the second half of the quarter, we pivoted to start rebuilding inventory and continue to do so. These lower inventory levels prevented us from fulfilling all of the demand that materialized in the second half of the quarter. ***We believe we continue to be well positioned to navigate the challenges presented by the COVID-19 crisis and take advantage of shifting consumer buying and selling patterns in favor of ecommerce***."

44.   On August 12, 2020, Defendants held an earnings call with analysts and investors to discuss Vroom's second quarter 2020 results hosted by the Individual Defendants.   In his prepared remarks, Defendant Hennessy stated that Vroom was in the midst of a "V-shape recovery" and that the Company's successful execution of its sales initiatives had provided "the added confidence to go bigger, faster."   Defendant Jones similarly stated that "despite lower average selling prices, we believe we will have ascending e-commerce gross profit per unit in the low to mid-single digits."   Later, in response to an analyst question, Defendant Hennessy stated:

> [W]e've got capacity . . . lined up not only in Q3 to match our guidance, but now – and then I'd call a catch-up period that allows us to continue on our scaled ramp in conjunction with our long-range plan. So we believe that we're almost out of this capacity constraint issue in this quarter.

Defendant Jones similarly responded to an analyst question: "[Y]ou had mentioned bottleneck [for vehicle reconditioning]. I think we're not currently experiencing any significant capacity constraints in any of those."

45.   On August 13, 2020, Vroom filed its second quarter 2020 results with the SEC on Form 10-Q, which was signed by the Individual Defendants, who also certified as to the accuracy of the report.   The Form 10-Q contained the financial information contained in the 2Q20 Press Release.

46.     On September 8, 2020, Vroom filed with the SEC a current report on Form 8-K. The Form 8-K provided an update regarding Vroom's operational and financial results, stating that the Company was performing "better than expected."   The Form 8-K raised the Company's quarterly earnings and profit guidance, and stated, in relevant part, as follows:

> Our inventory strategy is designed to take advantage of what we believe are structural shifts in consumer behavior and increased demand for the Vroom model, and *we have continued to scale our inventory levels in the third quarter of 2020. As higher inventory levels lead to higher conversion, we have experienced continued growth in ecommerce units sold. As well, the increase in demand combined with continuing supply constraints in the broader market has led to better than expected improvements in our gross profit per unit. As of the date of this report, we have seen our results continue to improve after the disruptions in the early stages of the COVID-19 pandemic*.

47.     Also on September 8, 2020, Vroom filed with the SEC a registration statement on Form S-1 for a follow-on stock offering, in which the Company sold 10.8 million shares of Vroom stock at $54.50 per share for nearly $590 million in gross offering proceeds (the "Secondary Offering").

48.     On September 11, 2020, Vroom filed the prospectus for the Secondary Offering with the SEC on Form 424B4, which formed part of and incorporated the registration statement for the offering (the "SPO Registration Statement").  The SPO Registration Statement was signed by the Individual Defendants.  The SPO Registration Statement stated that Vroom maintained "scalable and vertically integrated operations" and utilized data science and machine learning to "drive optimization and operating leverage across our ecommerce and vehicle operations" and to "enhance the customer experience . . . and optimize our overall inventory sales velocity."  The SPO Registration Statement similarly emphasized Vroom's "[e]normous inventory selection" and "[e]xceptional customer support."

49.     The SPO Registration Statement listed Vroom's purported ability to scale quickly and offer superior customer support as among the Company's greatest "Competitive Strengths." The SPO Registration Statement stated: "In addition to our in-house customer support personnel, we have partnered with a leading customer experience management provider to operate our primary call center.  This strategy enables us to centralize our contact center services, ensure consistency in customer interactions, increase conversion and maximize operating efficiencies." The SPO Registration Statement likewise stated that Vroom's "professional customer experience team accompanies the buyer through every step of the process to make sure all questions are answered and any concerns are addressed.  In all of our customer interactions, our goal is to ensure that every customer is a delighted customer."

50.     The SPO Registration Statement further highlighted Vroom's "asset-light" and "scalable operations" as offering major competitive advantages, stating, in relevant part, as follows:

### Asset-Light, Scalable Operations

An asset-light strategy is fundamental to our business model, and our future growth strategies are focused on developing our ecommerce business without the need for capital investment in physical retail locations. We seek to optimize the combination of ownership and operation of assets by us, with strategic third-party partnerships. ***Our strategy provides flexibility, agility and speed as we scale our business, without taking on the unnecessary risk and capital investment inherent in direct investment. We employ this hybrid approach across our business and utilize strategic relationships with experienced and trusted providers to optimize reconditioning services, logistics, consumer financing and customer experience.***

51.     The SPO Registration Statement likewise represented that Vroom employed a sophisticated, data-rich inventory management system to meet "real-time" fluctuations in customer demand and profitably adjust pricing, stating, in relevant part, as follows:

### Inventory Management

Our inventory assortment and pricing models ingest millions of data points each day as *we monitor, calibrate, and adjust our inventory position to fluctuations in the national market and within our ecommerce platform, including predicted sales performance and real-time customer demand and conversion*.

*Inventory Planning*

Using national demand and conversion data, including both Vroom historical performance and third-party sales, we establish target inventory levels by vehicle type, price point, mileage, features, and other key attributes. *We seek to maintain an optimal inventory mix to produce desired profits, sales velocity, and conversion outcomes as we manage our overall gross profit and growth rates*.

*Inventory Procurement*

We source inventory from auctions, consumers, rental car companies, OEMS and dealers. As we acquire vehicles, we continuously monitor inventory levels against our overall inventory model. *In sourcing vehicles, we ingest supply available for sale nationally in the wholesale market and target vehicles for purchase based on our retail criteria, target margins, expected sales velocity and consumer demand based on our data analytics*.

*Inventory Pricing*

Using recent national sales data and leveraging proprietary data analytics, we establish the likely fair market value of each distinct VIN in our inventory, making adjustments based on the unique characteristics of the vehicle. *Once the vehicle is posted for sale, we monitor real-time demand, conversion, sales velocity, and profitability data across our listed inventory. Using our data analytics, we constantly evaluate a variety of variables that impact conversion and adjust pricing, if needed, within our profitability targets*.

52.     The SPO Registration Statement also highlighted Vroom's purportedly robust growth trajectory, which the SPO Registration Statement attributed to proper inventory management and other factors, stating, in relevant part, as follows:

*Our business has grown significantly as we have scaled our operations*. Our growth is not attributable to a single innovation or breakthrough, but to coalescence around multiple strategies that serve as points on our flywheel. *The diversity and number of vehicles in our inventory drive demand and support expanded national marketing to enable us to acquire new customers more cost effectively, allowing us to invest back into our platform to continue to improve the customer experience, all of which drives increased conversion. This flywheel revolves,*

*builds momentum and ultimately propels our business forward as we seek to drive disciplined growth and operating leverage*.

53.     The SPO Registration Statement listed Vroom's ability to "Deliver Exceptional Customer Experience" as one of the key growth strategies on the Company's "Growth Flywheel," stating that Vroom provided "customers with an intuitive, trustworthy and convenient buying and selling experience, and we will continue to invest in our platform to further streamline the transaction process for our customers."  The SPO Registration Statement further stated that Vroom "will also continue to invest in the development of our mobile experiences, including iOS and Android mobile applications, to strengthen customer engagement" and that "these investments will lead to greater consumer traffic to our platform, higher levels of customer satisfaction and increased conversion and sales."

54.     The statements referenced in ¶¶ 43-46 and 48-53 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Vroom's inventory growth had far outpaced the capabilities of its existing sales and support personnel, creating a logistical bottleneck that threatened the Company's profits, the value of its existing inventory, and its ability to achieve positive cash flows; (ii) Vroom's lack of adequate sales and support staff had resulted in degraded customer experiences and lost sales opportunities; (iii) as a result of all the foregoing, Vroom needed to invest tens of millions of dollars in bolstering its sales and support and logistics networks, and Defendants had already planned such investments, materially impairing the Company's short-term profitability; (iv) as a result of all the foregoing, Vroom was poised to suffer accelerating losses and increased negative

cash flows, despite a robust online used car market; and (v) as a result of all the foregoing, the Company's public statements were materially false and misleading at all relevant times.

55.     Additionally, Defendants' failure to disclose the information in ¶ 54 in Vroom's SEC filings violated Item 303 and Item 105 because these adverse facts, trends, and uncertainties were known to Defendants and involved some of the most significant factors impacting the risk profile of Vroom securities and were likely to, and did, have a material adverse impact on Vroom's sales, revenues, and income from continuing operations.

56.     On November 11, 2020, Vroom issued the 3Q20 Press Release.  That press release stated that Vroom expected to suffer sharply higher losses in the fourth quarter of 2020, with adjusted EBITDA losses projected to increase from $36 million in the third quarter of 2020 to $48 million at the midpoint, a 33% sequential increase.  During the accompanying earnings call, Defendants revealed that Vroom was suffering from a "bottleneck" in its sales support and needed to invest heavily in building out the Company's sales support and logistics networks to avoid constrained growth, despite the favorable market environment.

57.     On this news, Vroom's stock price fell $5.31 per share, or 13.01%, to close at $35.49 per share on November 12, 2020, on unusually heavy trading volume of 9.2 million shares traded.  Despite this decline in the value of the Company's share price, Vroom securities continued to trade at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding the adverse events, trends, and uncertainties negatively impacting Vroom's business.

58.     For example, the 3Q20 Press Release stated that Vroom was on track to achieve the following financial results during the fourth quarter: (i) "average ecommerce gross profit per unit of $2,050 to $2,150"; (ii) "[t]otal gross profit of $24 to $28 million"; (iii) "EBITDA of ($52) to

($44) million"; and (iv) "[n]et loss per share of ($0.41) to ($0.35)."  In the 3Q20 Press Release, Defendant Hennessy also highlighted the purported strength of Vroom's business model and robust profit growth, stating, in relevant part, as follows:

> "I am very pleased with our results for the third quarter, in which we successfully managed the challenges presented by the COVID-19 pandemic, outperformed our plan, demonstrated the strength of our business model, and hit the accelerator on significantly scaling our business. *By doing the things we said we would do – adding vehicle inventory, increasing marketing, relying on data to drive decision making, and enhancing our customer experience -- we increased the velocity of the Vroom flywheel, drove conversion and increased GPPU. We will continue to execute our plan and invest in the growth of our business as we transform the market for buying and selling used vehicles*."

59.    On November 11, 2020, Defendants held an earnings call with analysts and investors to discuss Vroom's third quarter 2020 results hosted by the Individual Defendants. During the call, Defendant Hennessy stated that Vroom would have its sales support issues "rectified in Q4."  Defendant Hennessy also spoke positively about Vroom's increased inventory and described how the Company had successfully increased its gross profits, stating, in relevant part, as follows:

> *As we look at what drove our significant growth in units and gross profit, first and foremost, we see that our teams across the company executed against our playbook extremely well*. We leveraged our advanced data science to grow our listed inventory to over 12,000 units at the end of the quarter, a record high even compared to prepandemic levels, offering our customers outstanding selection and great prices. *Vroom was able to generate a significant increase in e-commerce gross profit per unit to $2,188, up 39% year-over-year and 104% over the second quarter. We have seen demand during the pandemic shift towards lower-priced vehicles, and we have responded to that demand. In doing so, we have demonstrated that we can deliver very strong unit economics over average selling prices in the mid-$20,000 range. This supports our long-range thesis that as we offer lower-priced vehicles, we'll be expanding our demand and conversion, while at the same time, expanding our unit economics*.

60.     Similarly, Defendant Hennessy claimed that Vroom was successfully taking advantage of increased customer demand by "improving unit economics," stating, in relevant part, as follows:

> The demand for Vroom model broadly and the demand for our products and services, specifically, remains very strong. There are a number of contributing factors. First, we continue to experience what we believe are structural changes in demand for our e-commerce and delivery model. ***Second, increased inventory drives increased demand and increased conversion, which spins our growth flywheel, as demonstrated by our performance in unit sales growth and improving unit economics***. Finally, we've begun to see the early results of our new brand campaign. We launched new spots that showcase Vroom's better way to buy and better way to sell a used vehicle.

61.     As described by Defendant Jones, Vroom was "efficiently" converting demand through a "focus" on the Company's sales platform, stating, in relevant part, as follows:

> Let me unpack the quarter a bit. E-commerce units sold in the third quarter increased 59% year-over-year, which was a new quarterly record for Vroom, driven by increased inventory and quality demand generation. As Paul mentioned, the e-commerce units were up 31% sequentially, again, due to an increased inventory offering. Listed vehicles increased to about 12,300 at the end of Q3, from 5,700 at the end of Q2 and are currently over 13,000. Of the 13-plus thousand vehicles listed today, excluding pending vehicle sales, approximately 72% are available for sale and the remainder are coming soon inventory. We are estimating 10,500 to 11,500 e-commerce units sold for Q4. The midrange of our guidance would imply 25% sequential growth quarter-to-quarter and accelerating 74% year-over-year growth compared to the 59% we experienced in Q3.

> Our formula is simple: Provide a data-driven selection of inventory, world-class marketing to create demand, and then we convert that demand. We currently have ample reconditioning capacity, we can create plentiful demand, as Paul mentioned, and ***we are currently expanding our sales platform to efficiently convert that demand. That's our focus in Q4***. Through the third quarter, our year-to-date e-commerce units sold has grown 86% year-over-year. ***And with our strong sequential growth quarter-to-quarter, we are on track for continued strong growth in 2021***.

62.     During the question-and-answer portion of the call, Defendant Hennessy continued to assert that Vroom was on track to meet its guidance and appropriately positioned to take

advantage of the heightened demand purportedly being experienced by the Company, stating, in

relevant part, as follows:

> **Ronald Victor Josey** – *JMP Securities LLC, Research Division – MD & Equity Research Analyst*
>
> Paul, I wanted to ask a little more about supply based on what we're just talking about. And I know – I think you just said you don't believe Vroom is supply constrained. So maybe can you talk a little bit more about how Vroom is positioned for the all-important first half of the year as we go into 2021 for supply as demand still remains sort of elevated for used cars? And as you talk about that, any insights on just the overall demand from an October perspective? Did that continue from what you saw for September? Any insights on intra-quarter would be helpful as well.
>
> **Paul J. Hennessy** – *Vroom, Inc. – CEO & Director*
>
> Sure. Supply, as I said, Ron, I think we're feeling in good shape. We're positioned ourselves to be selective because we've got great consumer demand to sell us their vehicles as well as auction market. Wholesale markets have come down, and we see great opportunity to buy cars there. So again, given our size, given our projected sales and our growth rate, we feel like we're in a great position going forward.
>
> ***As far as how are we doing intra-quarter, I guess what I'd say is I stand by our guidance. We just put guidance out there to give you really good insight based on everything that we're seeing thus far. And I think feel great about the numbers that Dave talked about in terms of e-commerce growth on a year-over-year basis. It's just – it's strong. So we're feeling really good***.

63.    Later, Defendant Jones claimed that Vroom's inbound logistics capabilities offered

a competitive "tailwind" that was supporting the Company's profit growth and an ultimate profit

level of $3,000 profit per unit.  Defendant Jones stated, in relevant part, as follows:

> **Zachary Robert Fadem** – *Wells Fargo Securities, LLC, Research Division – Senior Analyst*
>
> Another one on the GPPU line. And as you think about all the long-term opportunities here from lower reconditioning costs, lower days to sell customer-sourced vehicles, et cetera, could you talk about what factors are contributing the most upside today? And as you think about 2021, how should we size these buckets or opportunities as we move into the New Year?
>
> **David K. Jones** – *Vroom, Inc. – CFO*

Yes, Zach, thanks for the question. ***I think it's a little bit of everything, right?*** If we think through the whole process, Paul mentioned acquisitions, we've automated a majority of our acquiring effort now. We do hundreds of thousands of appraisals per week. And so that's really opened up the opportunities for us nationally for acquiring inventory. And as you know, those are skills that very few companies have. So we're very proud of that.

And so ***I think that gives us opportunities on sales margin. As we then continue to expand our distributed reconditioning network, we've got opportunities on inbound logistics. I mentioned we've got 18 facilities today, which is – puts us at a real advantage for ingesting in bound inventory from consumers and from auction and from different sources. So we think that's a tailwind***.

You mentioned reconditioning. We've been disclosing defects now for a while, and we continue to hone those skills and continue to work as hard as we can to set customer expectations both for the consumer experience, but it helps us refine our reconditioning efforts. And so we think there's a little bit across the board there. We've talked about – a little bit about product already.

***So I think it's a little bit of everything. I think when you think about Q4, obviously, we've got guidance out there for that. But we're ultimately – we've got a long-term goal to get to $3,000 of gross profit per unit. That's kind of our first stop – our first station stop on the train. And we feel like we're making good progress towards that, and we'll continue that effort in 2021***.

64.     On November 12, 2020, Vroom filed its third quarter 2020 results with the SEC on Form 10-Q (the "3Q20 10-Q"), which was signed by the Individual Defendants, who also certified as to the accuracy of the report.  The 3Q20 10-Q contained the financial information contained in the 3Q20 Press Release.

65.     The statements referenced in ¶¶ 58-64 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Vroom was unable to sell a significant portion of existing inventory as a result of inadequate sales personnel and overreliance on third-party sales support; (ii) Vroom's lack of adequate sales and support staff had resulted in severe growth constraints, degraded customer experience, lost sales opportunities,

and a greater than 10% increase in average days to sale for Vroom products; (iii) Vroom had been forced to mark down and liquidate existing inventory at fire sale prices; (iv) as a result of all the foregoing, Vroom's gross profit per vehicle had plummeted and the Company was suffering accelerating losses and increased negative cash flows, despite a robust online used car market; (v) as a result of all the foregoing, Vroom was on track to miss its already disappointing fourth quarter 2020 profit and earnings guidance and such guidance lacked any reasonable basis in fact; and (vi) as a result of all the foregoing, the Company's public statements were materially false and misleading at all relevant times.

66.     Additionally, Defendants' failure to disclose the information in ¶ 65 in the 3Q20 10-Q violated Item 303 and Item 105 because these adverse facts, trends, and uncertainties were known to Defendants and involved some of the most significant factors impacting the risk profile of Vroom securities and were likely to, and did, have a material adverse impact on Vroom's sales, revenues, and income from continuing operations.

### The Truth Fully Emerges

67.     On March 3, 2021, Vroom issued the 4Q/FY20 Press Release.  That press release was the third consecutive adverse report by the Company since going public and revealed operational issues and financial results far worse than previously disclosed to investors.  For the quarter, the 4Q/FY20 Press Release stated that Vroom suffered a net loss of $60.7 million, a 42% year-over-year increase.  This represented a $0.46 loss per share, which was outside the range provided by Defendants and 20% worse than the midpoint.  The 4Q/FY20 Press Release also stated that Vroom suffered a $55.9 million adjusted EBITDA loss during the quarter, which was also outside the range provided by Defendants and $8 million worse than the midpoint.  The 4Q/FY20 Press Release further stated that Vroom had achieved only $1,821 total gross profit per unit, which

was outside the range provided by Defendants and 13% below the midpoint, and generated only $878 gross profit per vehicle, which represented a 13% decline year-over-year.

68.     During the earnings call to discuss the results held that same day, Defendant Hennessy revealed that Vroom was suffering from severe sales backlogs because of inadequate sales and support staff, which had materially impaired the Company's ability to sell existing inventory. These backlogs, in addition to degrading the customer experience, had led to substantially lower gross profits per unit and caused the average days to sale per vehicle to increase 13% year-over-year to seventy-seven days.  Defendants acknowledged that Vroom was operationally constrained and unable to keep up with demand because of these sales constraints, which had forced the Company to liquidate aging inventory at fire sale prices for a significantly reduced profit or even at a loss, despite a historically favorable online used car market.  Defendants further revealed that Vroom's sales deficiencies were so severe that the deficiencies would continue to constrain the Company's profits well into the first quarter of 2021, even though Vroom had purportedly tripled its sales support staff.  As Defendant Hennessy admitted, "we bought more inventory than we could actually process and that excess inventory needed to be moved in Q4 and will continue to be moved in Q1."

69.     A March 4, 2021 analyst report by J.P. Morgan summarized market sentiment regarding the news: "[W]e see a longer road to re-establishment of execution credibility after the company has missed forward profit expectations for the first three quarters as a growth-oriented public company."

70.     Following these disclosures, Vroom's stock price fell $12.29 per share, or 28%, to close at $31.61 per share on March 4, 2021, on unusually heavy trading volume of 19.6 million

shares traded, representing a 42% decline from the price at which Vroom shares were sold in the Secondary Offering less than six months prior.

71.     In total, the price of Vroom stock has fallen nearly 60% from its Class Period high, despite a robust online car market that has propelled the stock prices for Vroom's primary competitors, such as Carvana Co. ("CVNA"), as reflected in the following chart:



72.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Vroom securities, Plaintiff and other Class members have suffered significant losses and damages.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

73.     Plaintiff brings this action as a class action on behalf of a class consisting of all persons and entities that purchased Vroom securities during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers, directors, and affiliates of Defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

74.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Vroom securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Vroom or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

75.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

76.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

77.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether Defendants' statements during the Class Period were materially false and misleading as detailed herein; and

- the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

78.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

79.     At all relevant times, the market for Vroom securities was an efficient market for the following reasons, among others:

- Vroom securities met the requirements for listing and were listed and actively traded on the NASDAQ, a highly efficient, national stock market;

- as a regulated issuer, Vroom filed periodic public reports with the SEC;

- Vroom regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- Vroom was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

80.     As a result of the foregoing, the market for Vroom securities promptly digested current information regarding Vroom from all publicly available sources and reflected such information in the price of Vroom's securities.  Under these circumstances, all purchasers of

Vroom securities during the Class Period suffered similar injury through their purchases of Vroom securities at artificially inflated prices and a presumption of reliance applies.

81.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.   Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects, information that Defendants were obligated to disclose, positive proof of reliance is not a prerequisite to recovery.   All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## ADDITIONAL SCIENTER ALLEGATIONS

82.     As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading.   Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.   Defendants, by virtue of their receipt of information reflecting the true facts regarding Vroom, and their control over and/or receipt and/or modification of Vroom's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

83.     Defendants knew and/or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

84.     The Individual Defendants, because of their positions with Vroom, controlled the contents of Vroom's public statements during the Class Period.  The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.  Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.  As a result, each of the Defendants is responsible for the accuracy of Vroom's corporate statements and is, therefore, responsible and liable for the representations contained therein.

85.     Defendants were motivated to engage in their fraudulent conduct to facilitate and maximize the amount of money Vroom could raise in the Secondary Offering.  As noted herein, Vroom raised approximately $590 million in the Secondary Offering at artificially inflated prices.  In addition, Defendant Jones sold over $4 million worth of Vroom stock at artificially inflated prices during the Class Period.  These sales were suspicious in both timing and amount.

86.     The scienter of Defendants is further underscored by the certifications mandated under the Sarbanes-Oxley Act of 2002 of the Individual Defendants filed during the Class Period, which acknowledged their responsibility to investors for establishing and maintaining controls to

ensure that material information about Vroom was made known to them and that the Company's disclosure-related controls were operating effectively.

## LOSS CAUSATION

87.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Vroom securities and operated as a fraud or deceit on Class Period purchasers of Vroom securities by failing to disclose and misrepresenting the adverse facts detailed herein.   When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Vroom securities declined significantly as the prior artificial inflation came out of the securities' price.

88.     As a result of their purchases of Vroom securities during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused Vroom securities to trade at artificially inflated levels throughout the Class Period, trading as high as $75.49 per share on September 1, 2020.

89.     By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Vroom's business, risks, and future financial prospects.  When the truth about the Company was revealed to the market, the price of Vroom securities fell significantly, removing the inflation therefrom and causing real economic loss to investors who had purchased Vroom securities during the Class Period.

90.     The decline in the price of Vroom securities after the corrective disclosures came to light was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price decline in

Vroom securities negates any inference that the losses suffered by Plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

91.     The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Vroom securities and the subsequent significant declines in the value of Vroom securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## **NO SAFE HARBOR**

92.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this complaint. Many of the specific statements pled herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Vroom who knew that those statements were false when made.

## **COUNT I**

### **(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

93.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

94.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

95.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC in that they:

- employed devices, schemes, and artifices to defraud;

- made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Vroom securities during the Class Period.

96.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Vroom securities.  Plaintiff and the Class would not have purchased Vroom securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

97.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Vroom securities during the Class Period.

## <u>COUNT II</u>

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

98.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

99.    The Individual Defendants acted as controlling persons of Vroom within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions as officers and/or directors of Vroom, the Individual Defendants had the power and authority to cause Vroom and its employees to engage in the wrongful conduct complained of herein.  Vroom controlled the Individual Defendants and all of its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Designating Plaintiff as Lead Plaintiff and declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  April 15, 2021

Respectfully submitted,

POMERANTZ LLP

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
James M. LoPiano
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com
jlopiano@pomlaw.com

BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Attorneys for Plaintiff*

Monday, April 12, 2021

## Vroom (VRM)

# CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

1.  I make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against Vroom, Inc. ("Vroom" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.  I did not purchase or acquire Vroom securities at the direction of plaintiffs counsel, or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.   I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Vroom securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  The attached sheet lists all of my transactions in Vroom securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.    I declare under penalty of perjury that the foregoing is true and correct.

**Name**

**Print Name**

Arif Hudda

1

**Signature**



(redacted)

**Full Name**

Arif Hudda



(redacted)

**Vroom, Inc. (VRM)**                                                                 **Hudda, Arif**

### List of Purchases and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 6/9/2020 | 10 | $44.0200 |